Atkinson, J.,
delivered the opinion of the court:
This is an action upon a contract to furnish wrapping twine for the Post Office Department for the fiscal year ending June 30, 1906. Different shipments of twine were made by plaintiff during the contract period, and because of imperfections in the tensile strength and yardage of the twine, the Postmaster General made certain deductions from the contract price which aggregated the sum of $2,591.82, and to recover said amount this suit is prosecuted.
obligated himself by the contract to furnish wrapping twine to measure not less than 600 yards to the pound, with a tensile strength of not less than 20.4 pounds, i. e., the strength to bear or sustain 20.4 pounds of dead weight. The contract further provided that in case the twine to be furnished did not measure up to the standard required the Postmaster General or the purchasing agent of his department should have authority to reject the same or to retain the same and to fix a price therefor that might to him seem just and equitable, and that he might withhold payment thereon if it should appear that in any particular the requirements of the contract had not been fulfilled.
case The main question, however, to be determined is whether the twine, during the period of controversy, possessed the tensile strength required by the contract; and as there are a number of witnesses on both sides of the case who testify in contradictory terms, we find it difficult to arrive at the true merits of the controversy.
year June 30, 1905, and ending June 30, 1906. The first complaint made by the Government to plaintiff as to the deficiency in the *358 tensile strength of the twine furnished under the contract was on July 31, 1905. On August 1 plaintiff replied: “All trouble of this kind will soon be rectified and the standard of quality, in every respect, maintained.” Plaintiff thereupon informed the manufacturer of the twine of its deficiency in strength and was told that better twine would thereafter be furnished, and added that “the trouble lies in the single yarn being too fine, thereby increasing the yardage at the expense of the tensile strength.” In the meantime complaints were coming into the Post Office Department from postmasters and postal clerks on trains from many parts of the country as to the tensile strength of the wrapping twine, and again and again the 'purchasing agent for the Post Office Department demanded of the plaintiff a better grade of twine, explaining to him from reports made by the inspectors of the purchasing department that the tensile strength of the twine he was furnishing on an average was below 17 pounds, while the contract required 20.4 pounds. As a result of this continued shortage, the department, on November 21, 1905, began to charge to the plaintiff, in his current account, at the rate of 3 cents per pound, the difference between the tensile strength of the twine received, as shown by the department’s testing machine, and the strength of 20.4 pounds required by the contracts, which deductions from that date up to and including December 6 amounted to $2,591.82.
These deductions caused plaintiff to challenge the correctness of the department’s testing machine, and at his request it was taken to the Government Bureau of Standards for examination. This examination showed several irregularities in the machine, but when it was recalibrated by the Bureau of Standards, the tests made by it showed three-tenths greater strength than the machine used by the Bureau of Standards. Several balls of plaintiff’s twine were then tested. The bureau’s machine revealed the tensile strength of them to be 16.8 pounds, and the Post Office Department’s machine, after it had been recalibrated, revealed a tensile strength of the same twine to be 17.1 pounds. Thus it was shown that the twine was, at the lowest figure, 3.6 pounds below the standard fixed by the contract.
*359 It is contended, however, by the plaintiff that the few halls of his twine which were tested by the Bureau of Standards should not be regarded as a fair or just average of all the twine he had furnished during the several months em- • braced in this controversy. On the other hand, defendants insist that the testing machine used by the Post Office Department was an accurate machine, and that the irregularities therein which were found by the Bureau of Standards resulted from the removal of the machine from the Post Office Department to said bureau.
It appears from the testimony that a carload of about 30,000 pounds of twine was returned to plaintiff on account of weakness in tensile strength, and it further appears that after an inspection of the same by the manufacturer who was supplying the twine to plaintiff, all of said twine was returned to the Post Office Department, except about 1,000 pounds which was regarded as deficient, and it was accepted and used by said department. It further appears that large quantities of defective twine were used because of urgent necessity, and for this reason plaintiff was charged 3 cents per pound for such shortage, as provided in section 4 of the contract hereinafter quoted.
But claimant’s counsel contends that the Postmaster General, being one of the parties to the contract, did not possess the legal right to decide that the exigencies of the postal service required the acceptance of inferior twine and that he did not possess the absolute right to fix such, price as might seem to him just and reasonable under the circumstances. In other words, counsel insists that by so doing he assumed the functions of a judge sitting in his own case. Article 4 of the contract reads:
“ That if any articles delivered under this contract are found, in the opinion of the Postmaster General, to be not in accordance with the contract requirements, the Postmaster General may reject any or all of such articles; but if, in the judgment of the Postmaster General, the exigencies of the public service require the acceptance of any such inferior articles, the Postmaster General may, and the right is hereby accorded to him absolutely, to fix such price therefor as may seem to him just and reasonable under the circumstances; and the payment of such price for the articles so accepted *360 shall be a complete discharge of liability on the part of the United States therefor.”
We can not agree with that contention. The contract is ' between the United States, as the party of the first part, and the plaintiff in this case, as the party of the second part. The Postmaster General, therefore, is in no wise interested except to see that the interests of the United States are properly protected.'
The fourth article of the contract above quoted distinctly provided for such deductions from the stipulated price as the Postmaster General might deem reasonable and just. Under this authority he, as the legally constituted arbiter of both parties, deducted from the price stipulated in the contract the sum of 3 cents per pound for certain shipments of twine which fell below the standard required by the contract. By so doing he was exercising the authority given to him by the contract; and as there is no claim made that such deductions embodied fraud, bad faith, or gross negligence on his part, nor is such misconduct anywhere shown by the evidence, his action can not be subjected to the re-visory power of the courts without doing violence to the plain words of the contract.
In the case of Kihlberg v. United, States (97 U. S., 398, 401), wherein the contract relating to a certain freight route, made the chief quartermaster the arbiter of the length of the route, it was said:
“ Indeed, it is not at all certain that the Government would have given its assent to any contract which did not confer upon one of its officers the authority in question. If the contract had not provided distinctly, and in advance of any services performed under it, for the ascertainment of distances upon which transportation was to be paid, disputes might have constantly arisen between the contractor and the Government, resulting in vexatious and expensive and, to the contractor oftentimes, ruinous litigation. Hence the provision we have been considering. Be this supposition as it may, it is sufficient that the parties expressly agreed that distances should be ascertained and fixed by the- chief quartermaster, and in the absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, his action in the premises is conclusive upon the appellant as well as upon the Government. The *361 contract being free from ambiguity, no exposition is allowable contrary to the express words of the instrument.”
That case is on all fours with the case at bar, and in our judgment should be regarded as controlling in this controversy.
Considering the whole case, our conclusion is that the Post Office Department was justified in making the deductions from the wrapping twine furnished by plaintiff, because it was materially below the tensile strength required by the contract; and, inasmuch as bad faith, negligence, or fraud is not shown, the petition is dismissed.